UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **MARK GATES,** § | | |
| § | | |
| Plaintiff, § | | |
| v. § | CIVIL ACTION NO. H-06-1835 | |
| § | | |
| **HARTFORD LIFE GROUP INSURANCE** § | | |
| **COMPANY, f/k/a CNA GROUP LIFE** § | | |
| **ASSURANCE COMPANY,** § | | |
| § | | |
| Defendant. § | | |

**MEMORANDUM AND ORDER**

Pending before the Court are Plaintiff's Motion for Summary Judgment (Docket No. 25), Defendant's Motion for Summary Judgment (Docket No. 28), Plaintiff's Objections to Defendant's Summary Judgment Evidence (Docket No. 31), and Defendant's Objections to Plaintiff's Designation of Expert Witnesses and Objections to Impermissible Opinion Testimony of Lay Witnesses (Docket No. 19). After considering the parties' filings and the applicable law, the Court finds that Plaintiff's Motion for Summary Judgment is **DENIED**, and Defendant's Motion for Summary Judgment is **GRANTED**. Plaintiff's Objections to Defendant's Summary Judgment Evidence are **SUSTAINED**. Defendant's Objections to Plaintiff's Designation of Expert Witnesses and Objections to Impermissible Opinion Testimony of Lay Witnesses are **OVERRULED AS MOOT**.

**I. BACKGROUND**

Plaintiff brings this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, alleging that Defendant wrongfully terminated his long-term disability benefits. At issue is a group insurance policy ("the Policy") issued

by Continental Casualty Co. to Goodyear Tire & Rubber Co. as part of its employee welfare benefits plan. The Policy was administered by CNA Group Life Assurance Company, a predecessor to Defendant Hartford Life Group Insurance.[1] Under the Policy, long-term disability benefits will be paid "for each month of Total Disability which continues after the Elimination Period."[2] Total disability occurs when "the insured Employee, because of Injury or Sickness, is 1) continuously unable to engage in any occupation for which the Insured Employee is or becomes qualified by education, training or experience; and 2) under the Appropriate and Regular Care of a legally qualified physician, other than the Insured Employee, whose specialty or expertise is the most appropriate for the Insured Employee's disabling condition(s) according to Generally Accepted Medical Practice." Def.'s Mot. Summ. J., Ex. 1(a) at 00011.

Plaintiff was formerly employed by Goodyear as a maintenance mechanic, and was covered under the Policy.[3] On June 6, 2002, Plaintiff was involved in a motorcycle accident and suffered injuries to his right leg. Dr. John Kosty, who had treated Plaintiff for a number of years for a hip condition, operated on Plaintiff immediately following the accident.

Beginning on June 7, 2002, Plaintiff received short-term disability benefits under his employer's plan. CNA administered this claim. In a letter dated October 30, 2002, CNA informed Plaintiff that his short-term benefits could continue for up to fifty-two weeks, as long as Plaintiff remained unable to perform his regular occupation. The letter

---

[1] As will be discussed further below, the Policy does not actually identify CNA as the plan administrator. Hartford nevertheless maintains (and the administrative record demonstrates) that CNA administered the Policy, and defends the instant case as CNA's successor.
[2] Under the Policy, the "Elimination Period" refers to "the number of months at the beginning of a continuous period of Disability for which no benefits are payable." There is no dispute in this case about the relevant Elimination Period.
[3] These undisputed facts are drawn primarily from Defendant's Motion for Summary Judgment.

also stated that in order to qualify for long-term benefits, Plaintiff would have to meet the definition of "total disability" under the Policy, and explained that CNA would evaluate whether or not Plaintiff could "engage in any occupation outside of Goodyear." As part of its investigation, CNA sent a vocational case manager to interview Plaintiff on April 30, 2003. According to notes of the interview, Plaintiff reported that he could drive and perform household chores; that he spent his time fixing motor and engine components; and that he could walk independently, but used a cane "some."

On May 2, 2003, Plaintiff received notice of an award from the Social Security Administration, which determined that he was disabled as of June 6, 2002. On June 30, 2003, CNA informed Plaintiff that it had approved his long-term disability benefits effective June 7, 2003, and that benefits would be payable as long as Plaintiff remained "totally disabled from any occupation for which you are or become qualified by education, training or experience."

In July 2003, Plaintiff underwent hip surgery unrelated to the motorcycle accident. During a telephone call by the vocational case manager to Plaintiff in October 2003, Plaintiff indicated that he was still using a cane, but that if he is "up any amount of time he has severe lower back pain." Plaintiff stated that he could perform household chores but that he "does not last long." Plaintiff was able to drive an automatic car and reported again that he spent time sitting in his garage fixing engines and motors. Although Plaintiff was skeptical that he could return to his former job, he noted "he could do possible bench work or pipe drafting, but adds that even with sitting his right leg swells and he needs to prop it up in the evenings." The case manager informed Plaintiff that a request would be sent to Dr. Kosty and to the physician who had performed the hip

surgery, Dr. Michael Grecula, to determine his "current restrictions and return to work prognosis."

On November 4, 2003, CNA sent a Functional Assessment Tool (FAT) to Drs. Kosty and Grecula. The FAT specifically asked the physicians whether Plaintiff was "currently capable of performing full time work which is primarily seated in nature but does allow the flexibility to stand when needed and does not require lifting over 10 lbs." Dr. Grecula completed the FAT on November 11, 2003, agreeing that Plaintiff could perform the work described, but adding the limitation of "no lifting." Dr. Kosty did not initially complete the FAT, but inquired as to CNA's "intentions in regard to this questionnaire," opining that Plaintiff "has no other occupational skills at this moment" and expressing concern that his benefits might be imminently terminated.

In December, CNA obtained a "Labor Market Survey" from Pinder Rehabilitation Services, LLC, regarding Plaintiff's case. The survey referenced the opinions of Drs. Grecula and Kosty,[4] and also alluded to information received from the CNA vocational case manager who had interviewed Plaintiff. The survey identified certain jobs that Plaintiff would be able to perform if restricted to seated work with some standing when needed, and no lifting (*e.g.*, sales professional, call center representative).

By letter dated December 11, 2003, CNA informed Plaintiff that his long-term disability benefits were being discontinued, as his medical conditions did not meet the Policy definition of "total disability." The letter cited Plaintiff's interviews with the vocational case manager, the FAT completed by Dr. Grecula, and other jobs that Plaintiff could perform. The letter informed Plaintiff of his right to appeal the decision, and

---

[4] Because only Dr. Grecula had, at that point, provided an opinion as to Plaintiff's functional capacity, it appears that the reference to Dr. Kosty was erroneous.

4

explained that he would receive two additional months of benefits "to assist you in the transition period."

The administrative record reflects further medical evidence gathered after the initial benefits termination. On January 6, 2004, Dr. Kosty sent a Return to Work Status Plan to Plaintiff's employer, indicating that Plaintiff had no restrictions on bending, twisting, pushing, or pulling; that he could infrequently kneel, squat, and climb stairs; and that he could stand or walk for five hours a day. Dr. Grecula noted in his records on January 20 that Plaintiff was "[r]eleased to return to work with light duty restrictions." On March 16, Dr. Kosty wrote to Plaintiff's employer, stating that Plaintiff could not lift or carry more than twenty-five pounds, run for an extended distance, or perform persistent bending, squatting, or kneeling. However, Dr. Kosty opined that Plaintiff could stand and ambulate during an eight-hour work day with regular breaks, and was "suited to light to medium work capacity so long as it does not require frequent or extensive climbing." In a follow-up letter to a Goodyear physician dated May 5, 2004, Dr. Kosty noted that there were no limitations on Plaintiff's basic functions, activities of daily living, manual dexterity, or upper extremity strength, although his climbing abilities were impaired. Nevertheless, Dr. Kosty wrote that Plaintiff could perform at "a physical demand level not to exceed *medium work capacity*," and could perform tasks like those required in a chemical plant.

On May 19, 2004, Plaintiff requested (through counsel) an appeal of the benefits termination decision. On July 1, Plaintiff submitted additional medical records from Dr. Kosty, as well as a report by Pamela Lewis, Ph.D., a vocational rehabilitation counselor and consultant. Dr. Lewis's report criticized CNA's use of the December 2003 Labor

5

Market Survey, and asserted that Plaintiff was physically unsuited (and possessed no transferable skills) for any sedentary jobs "in today's labor market," including all of the alternative occupations identified in the survey. The report did observe, however, that Plaintiff was "eager to return to work and will likely be a good candidate for vocational rehabilitation and formal training." In response, Hartford (having succeeded CNA) stated that "[t]he review of the additional medical information provided supports that your client's restrictions have changed from the previous assessment. Therefore, we are currently reviewing alternative occupations within your client's current restrictions as part of the initial reconsideration of the claim at this time."

Hartford referred Plaintiff's case to Andrea Brown, a vocational consultant, for another Labor Market Survey, taking into account the newly submitted information (both from Dr. Kosty and Dr. Lewis). Brown issued a report on July 12. The report specifically cited the physical restrictions described by Dr. Kosty and identified a variety of jobs classified as light to medium demand, including supervisor/leadman/foreman, maintenance lead mechanic, and others. On July 13, Plaintiff submitted additional medical records from Dr. Grecula, arguing that they confirmed Plaintiff's restriction to light work.

Hartford informed Plaintiff on July 19 that its decision to terminate long-term benefits remained unchanged after review of the additional information, and that Plaintiff's file was being forwarded to the Appeals Committee. On August 30, Plaintiff learned that the termination had been upheld. Plaintiff wrote back to Hartford on September 8, attaching a Vocational Assessment Addendum by Dr. Lewis, in which she critiqued the second Labor Market Survey, stated that Plaintiff was restricted to sedentary

and light occupations, and opined that Plaintiff did "not meet the job requirements for any of the occupations included in the most recent Labor Market Survey used to affirm the termination of his benefits." Hartford did not respond to this letter.

Plaintiff filed the instant lawsuit in June 2006. In a Memorandum and Order dated October 16, 2006 (Docket No. 13), the Court granted Defendant's motion to dismiss all of Plaintiff's state law claims, his ERISA claim for breach of fiduciary duty, and any claim for extracontractual compensatory damages. Plaintiff and Defendant each move for summary judgment on Plaintiff's remaining cause of action, for past and future disability benefits under Section 502(a)(1)(B) of ERISA.[5]

## II. ANALYSIS

### A. Summary Judgment Standard

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.*

---

[5] Under Section 502(a)(1)(B), "[a] civil action may be brought by a participant or beneficiary to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B) (2006).

In accordance with the law of the circuit, the Court's inquiry in this case has been limited to the administrative record submitted with Defendant's Motion for Summary Judgment. "When assessing factual questions, the district court is constrained to the evidence before the plan administrator." *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 299 (5th Cir. 1999) (citing cases). Upon reviewing the administrative record, the Court finds that there are no material facts in dispute, and that all claims are appropriately submitted for summary judgment.

The Court **SUSTAINS** Plaintiff's objections to Exhibit 2 submitted by Defendant, consisting of the Summary Plan Description associated with the Policy. Defendant offers the SPD to establish that the Policy endows CNA/Hartford with discretion and authority to determine eligibility for benefits and to construe and interpret the terms and provisions of the Policy, and therefore that CNA/Hartford's interpretation of Policy terms should be accorded deferential review. Defendant does not contest, however, that the SPD is not part of the administrative record. Defendant also cites no authority for the proposition that evidence outside the record may be admitted if it will be used only to determine the applicable standard of review. Therefore, the SPD is not competent summary judgment evidence.[6]

---

[6] Defendant suffers no harm from the exclusion of the SPD, because in the Court's view, the SPD does not grant discretion or authority to CNA to interpret and construe the terms of the Policy. According to the SPD, "[t]he Plan Administrator shall have the sole and absolute discretionary authority and power to interpret plan provisions and make factual determinations in administering and carrying out the provisions of the Plan . . .". Def.'s Mot. Summ. J., Ex. 2 at 00608. The SPD specifies that *"[t]he Goodyear Tire & Rubber Company* is the sponsor and Plan administrator . . . . The Company, which shall be the 'administrator' of Plans 531 [including the Policy], 532 and 533 described in this booklet for purposes of ERISA and the 'plan administrator' for purposes of the Internal Revenue Code, shall be responsible for the general administration of Plans 531, 532 and 533." *Id.* at 00609 (emphasis added). Therefore, it appears that only Goodyear, not CNA, is identified in the SPD as having discretion and authority to interpret plan provisions. Defendant points to the language in the SPD stating that "[t]he Company may delegate to a third party administrator in whole or in any part any of this authority." *Id.* at 00608. Although there is ample evidence that CNA did, in fact, act as a third party administrator, there is no recorded delegation of discretion or authority from Goodyear to CNA in the SPD.

**B. Standards of Review**

If an ERISA-governed plan "does not vest discretionary authority with the plan administrator or fiduciary, or is silent regarding such authority . . . eligibility determinations are reviewed *de novo*." *Cathey v. Dow Chem. Co. Med. Care Program*, 907 F.2d 554, 558 (5th Cir. 1990); *see also Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). As discussed above, the Policy does vest this discretionary authority with a plan administrator, but that administrator is Plaintiff's employer Goodyear, not CNA or Hartford. Although it appears that CNA and Hartford acted as third party administrators on Goodyear's behalf, there is no recorded delegation of authority to CNA anywhere in the Policy. Therefore, the Court will review any interpretation or construction of Policy terms made by CNA or Hartford *de novo*.

All factual determinations made by CNA or Hartford, however, are subject to abuse of discretion review. *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552, 1562 (5th Cir. 1991). Under abuse of discretion review, a district court must defer to the administrator's determination unless it is shown to be arbitrary and capricious. *Meditrust Fin. Servs. Corp. v. Sterling Chems., Inc.*, 168 F.3d 211, 215 (5th Cir. 1999) (affirming "the use of the 'arbitrary and capricious' analysis as part of abuse-of-discretion review"). The administrator's determination must be supported only by "substantial evidence." *Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 273-74 (5th Cir. 2004) ("If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail."). The burden lies on Plaintiff to show that CNA's benefits determination was arbitrary and capricious. *E.g.*, *Perdue v. Burger King Corp.*, 7 F.3d 1251, 1254 n.9 (5th Cir. 1993) ("A claimant under section 1132(a)(1)(B) has the initial

9

burden of demonstrating an entitlement to benefits under an ERISA plan, or that a denial of benefits under an ERISA plan is arbitrary and capricious.").

Plaintiff contends that Hartford Life is both the plan administrator and plan insurer, and that it may therefore have a conflict of interest in making benefits determinations. Pl.'s Resp. 4. The Fifth Circuit has acknowledged these potential conflicts, and has adopted a "sliding scale" approach to determining the extent of the conflict in each case. *Vega*, 188 F.3d at 297 ("we reaffirm today that our approach to this kind of case is the sliding scale standard . . . The greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be."). Hartford disputes, however, that it was the insurer of the plan, stating that the Policy was issued by Continental Casualty Company. Even if Defendant did play a dual role with regard to the Policy, Plaintiff has offered no evidence to suggest an actual conflict, and the Court would see no reason to depart significantly from the basic standards of review set forth above.

### C. Defendant's Motion for Summary Judgment

Defendant moves for summary judgment on Plaintiff's Section 502(a)(1)(B) claim, arguing that its termination of Plaintiff's long-term disability benefits was not an abuse of discretion. Plaintiff counters that the termination was, in fact, arbitrary and capricious, for two reasons: 1) Defendant misinterpreted the meaning of "total disability" under the Policy; and 2) the termination was not supported by substantial evidence. In the Court's view, neither of Plaintiff's arguments is persuasive. Therefore, the Court grants summary judgment on Plaintiff's Section 502(a)(1)(B) claim to Defendant.

### 1. Defendant's interpretation of Policy terms

As discussed above, the Court reviews Defendant's interpretation of Policy terms *de novo*. At issue is the meaning of "total disability," which is defined by the Policy to mean that, in relevant part, "the Insured Employee, because of Injury or Sickness, is continuously unable to engage in any occupation for which the Insured Employee is or becomes qualified by education, training or experience." Def.'s Mot. Summ. J., Ex. 1(a) at 00011. Plaintiff asserts that Defendant erroneously excluded the concept of "gainful occupation" from its interpretation of "total disability." In other words, Plaintiff argues that he should be considered "totally disabled" if there are no occupations he could perform involving specific skills and vocational experience he already possessed, and accompanied by a salary comparable to his pre-accident earnings. Plaintiff contends that Defendant identified no alternative occupations, in either the December 2003 or July 2004 Labor Market Surveys, for which Plaintiff was specifically qualified or experienced by virtue of his high school education and previous training as a welder and mechanic, and which would compensate him at levels similar to his pre-accident salary. Therefore, Plaintiff reasons, he was "totally disabled" under the Policy.

When conducting *de novo* review of the interpretation of Policy terms, the Court should view the language of the Policy in an ordinary and popular sense, so that the language is given its generally accepted meaning. *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 818 (5th Cir.1997). If the terms of the Policy remain ambiguous after applying ordinary principles of contract interpretation, courts must construe the terms strictly in favor of the insured. *E.g.*, *Todd v. AIG Life Ins. Co.*, 47 F.3d 1448, 1451-52 (5th Cir. 1995) (citing cases). In the Court's view, the meaning of "total disability" under the

11

Policy is straightforward and unambiguous: Plaintiff must be "continuously unable to engage in *any* occupation for which the Insured Employee *is or becomes* qualified by education, training or experience." (Emphasis added.) The total disability provision does not specify that Plaintiff must be able to engage in an occupation substantially similar to that which he performed before, nor does it contain any sort of pre-disability earnings qualifier. The Court finds nothing in the total disability provision or in the Policy that entitles Plaintiff to "occupation insurance," rather than disability insurance.[7]

In fact, the law in this Circuit indicates that Defendant was not obligated to identify, using the services of a vocational expert, any alternative occupation, much less an occupation for which Plaintiff might have specifically transferable skills, and which might provide a comparable salary. *See Dabon v. Aetna Life Ins. Co.*, 61 Fed. Appx. 120 (5th Cir. 2003) (finding no abuse of discretion where a plan administrator did not conduct a formal Labor Market Survey, and noting that "an administrator has no obligation to reasonably investigate a claim.") (citing *Vega*, 188 F.3d at 298); *Duhon v. Texaco, Inc.*, 15 F.3d 1302, (5th Cir. 1994) (holding that "it was not an abuse of discretion for the plan administrator to conclude that Duhon was capable of performing some type of occupation without obtaining the opinion of a vocational rehabilitation expert . . . it was not

---

[7] Plaintiff urges the Court to consider the total disability provision in light of the "rehabilitative employment benefit" provision, under which an employee receives a monthly benefit "less a portion of the Insured Employee's earnings from [rehabilitative] employment." This benefit ceases "on the earliest of the following: 1) the date the Insured Employee's earnings from such Rehabilitative Employment equal or exceed 100% of the Insured Employee's pre-Disability Earnings; or 2) at the end of the Maximum Period Payable." Def.'s Mot. Summ. J., Ex. 1(a) at 00012. Plaintiff reasons that because the rehabilitative employment provision refers to the insured employee's pre-disability salary, the same sort of reference must be read into the total disability provision as well. However, nothing in either provision or elsewhere in the Policy directs the Court to infer such a reference. Indeed, the presence of a reference to "pre-Disability Earnings" in the rehabilitative employment provision strongly suggests that a similar clause could have been inserted into the total disability provision, if it had been intended to include one. Finally, the Court agrees with Defendant that even the rehabilitative employment provision does not contain the sort of "pre-disability earnings qualifier" that Plaintiff asserts should be included in the total disability provision.

necessary under this plan that the administrator 'insure the availability of an alternative job' for Duhon before terminating his benefits."). Both *Dabon* and *Duhon* involved disability provisions similar to the one in the present lawsuit, and in neither case did the Fifth Circuit infer any obligation by the insurer to identify comparable employment before considering the claimant totally disabled. Therefore, the Court sees no reason, derived either from the Policy or from the relevant case law,[8] to add a "gainful occupation" requirement (which would actually amount to an "occupation similar in character and compensation" requirement) to the total disability provision at issue. The Court finds that Defendant did not err in excluding such a requirement from its interpretation of the Policy.

### 2. Defendant's determination that Plaintiff was not "totally disabled"

The Court must now decide whether Defendant's factual determination that Plaintiff was no longer totally disabled was supported by substantial evidence, or whether it was arbitrary and capricious. "Substantial evidence is 'more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Ellis*, 394 F.3d at 273 (quoting *Deters v. Sec'y of Health, Educ., & Welfare*, 789 F.2d 1181, 1885 (5th Cir. 1986)).

The Court finds that each of Defendant's determinations that Plaintiff was no longer totally disabled was supported by substantial evidence. The initial denial letter, sent in December 2003, set forth three bases for the termination of benefits: the

---

[8] Plaintiff refers the Court to Texas state court cases which it asserts "support[] an assessment of the 'gainful occupations' Mark Gates was qualified to perform by reasons of his physical limitations, education, training, work experience, and earning capacity." Pl.'s Resp. 15. However, Texas state law does not control when a federal court analyzes an insurance policy under ERISA; rather, a court must primarily consult federal common law. *E.g.*, *Wegner*, 129 F.3d at 818; *see also Todd*, 47 F.3d at 1451. The Court has already identified relevant federal precedent that directly contradicts Plaintiff's arguments, and it is unnecessary in this case to consult "analogous state law."

vocational case manager's interviews of Plaintiff in April and October 2003; the FAT returned by Dr. Grecula in November 2003, indicating Plaintiff's ability to perform work that is primarily seated, but with the flexibility to stand (and with no lifting); and the December 2003 Labor Market Survey. Plaintiff argues that this does not constitute "substantial evidence," but under the required standard of deferential review, the Court must disagree. The evidence – particularly the FAT completed by Plaintiff's treating physician – is not overwhelming, but constitutes something more than a scintilla, and "is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[9] Defendant did not abuse its discretion in determining in December 2003 that Plaintiff was not totally disabled from performing *any* occupation.

Upon reconsideration and review of the termination of benefits, a significant amount of additional evidence was introduced into the record, including Dr. Kosty's January 2004 Return to Work Status Plan, indicating that Plaintiff had no restrictions on bending, twisting, pushing, or pulling that he could infrequently kneel, squat, and climb stairs, and that he could stand or walk for five hours a day; Dr. Grecula's January 20, 2004 note that Plaintiff was "[r]eleased to return to work with light duty restrictions"; Dr. Kosty's March 16 letter stating that Plaintiff could not lift or carry more than twenty-five pounds, run for an extended distance, or perform persistent bending, squatting, or

---

[9] Plaintiff points the Court to Dr. Lewis's report, in which she opines that with a "no lifting" restriction, Plaintiff would not even be able to perform work at a sedentary level of exertion. Def. Mot. Summ. J., Ex. 1(g) at 00425. Dr. Lewis's opinion does not fatally undermine Defendant's initial benefits determination, however. First, Dr. Lewis's report was not available to Defendant until June 2004, six months after the decision to terminate benefits was made. Second, the report states only that the no lifting restriction "*significantly erodes* the base of jobs that exist at the sedentary level of physical demand," not that there are *no* jobs that would be suited to Plaintiff's limitations; the report appears to be more concerned with Plaintiff's "transferable skills" and previous wage as a welder and maintenance mechanic. The Court has already explained that Defendant was not required to consider these factors in determining whether Plaintiff was totally disabled, and was not obligated to investigate alternative occupations. Therefore, Dr. Lewis's report does not contravene Defendant's initial determination that Plaintiff would be able to perform some occupation.

14

kneeling, but could stand and ambulate during an eight-hour work day with regular breaks, and was "suited to light to medium work capacity so long as it does not require frequent or extensive climbing"; Dr. Kosty's May 2004 letter noting that there were no limitations on Plaintiff's basic functions, activities of daily living, manual dexterity, or upper extremity strength, and that Plaintiff could perform at "a physical demand level not to exceed *medium work capacity*"; and the July 2004 Labor Market Survey.  In the Court's view, these indications clearly constitute "substantial evidence" that Plaintiff was no longer totally disabled from performing any occupation, and Plaintiff's contentions to the contrary are unavailing.

First, Plaintiff repeatedly argues that after the initial benefits decision, "Hartford received and created additional information that it used to 'justify' its denial of Mark Gates' administrative appeal.  This evidence included some additional medical records from Drs. Grecula and Kosty, as well as a 'new' Labor Market Survey."  Pl.'s Resp. 7.  The Court has already found that the initial benefits decision was "justified" under abuse of discretion review, and finds Plaintiff's argument curious in that the additional medical information was submitted by Plaintiff, as part of his request for review and reconsideration of the termination.  Further, Plaintiff's attacks on the July 2004 Labor Market Survey are irrelevant in light of the Court's ruling above that Defendant was not required, either by the "total disability" provision or by ERISA case law, to identify alternative occupations ideally suited to Plaintiff's transferable skills and previous wage level.[10]  Finally, Plaintiff argues that Defendant overlooked the Social Security Administration's determination that he was disabled, and its subsequent award of

---

[10] Indeed, the Labor Market Survey itself is irrelevant, especially in light of the significant and uncontradicted evidence that both Drs. Kosty and Grecula considered Plaintiff able to return to some sort of work.

15

benefits. Plaintiff cites to no authority from this Circuit, however, indicating that a Social Security Administration finding of disability is binding on a plan administrator. Further, the Court notes that Plaintiff learned of the favorable Social Security award in May 2003, long before either of his treating physicians opined that he would be able to return to some kind of work.[11]

For the above reasons, the Court finds that Defendant's factual determination that Plaintiff was no longer totally disabled was not an abuse of discretion, and that Defendant is entitled to summary judgment on Plaintiff's Section 502(a)(1)(B) claim for benefits.

### 3. Defendant's counterclaim for attorney's fees

Defendant counterclaims for attorney's fees under 29 U.S.C. §1132(b), under which "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." The Court determines in this case that each party shall bear its own costs and fees.

### D. Plaintiff's Motion for Summary Judgment

Plaintiff's Motion for Summary Judgment on his Section 502(a)(1)(B) claim presents essentially the same arguments as his Response to Defendant's Motion for Summary Judgment, which the Court has already granted. Plaintiff adds only that Defendant's failure to consider and respond to his submission of Dr. Lewis's addendum in September 2004, after the termination of his benefits had been affirmed by the appeals committee, violated the "full and fair review" requirement of ERISA. Under 29 U.S.C. §

---

[11] The Social Security award states that Plaintiff "became disabled under our rules on June 6, 2002." Pl.'s Mot. Summ. J., Ex. 10 at 00562. Defendant also considered Plaintiff disabled as of June 6, 2002, and approved short-term disability benefits for one year thereafter, and long-term disability benefits starting on June 7, 2003. The decision to terminate those benefits, as well as the affirmation on reconsideration and appeal, was based on evidence that was not before the Social Security Administration at the time it rendered its award.

16

1133(2), "every employee benefit plan shall afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." Further, "[c]hallenges to ERISA procedures are evaluated under the substantial compliance standard." *Robinson v. Aetna life Ins. Co.*, 443 F.3d 389, 392 (5th Cir. 2006).

In this case, Defendant afforded Plaintiff two levels of review: reconsideration of the initial decision to terminate benefits, and review by the appeals committee. Defendant considered additional medical evidence submitted by Plaintiff, as well as Dr. Lewis's initial report. Although Dr. Lewis's addendum contained new references to the July 2004 Labor Market Survey, her analysis was substantively similar to that contained in her first report: that the survey failed adequately to consider Plaintiff's past work experience, training, and salary, and identified jobs for which Plaintiff was unsuited. In the Court's judgment, Defendant substantially complied with the "full and fair review" requirement set forth in Section 1133, and Plaintiff was not prejudiced by the lack of response to Dr. Lewis's addendum. Therefore, Plaintiff's Motion for Summary Judgment is **DENIED.**

### III. CONCLUSION

Defendant's Motion for Summary Judgment is **GRANTED.** Plaintiff's Motion for Summary Judgment is **DENIED**. Plaintiff's Objections to Defendant's Summary Judgment Evidence are **SUSTAINED.** Defendant's Objections to Plaintiff's Designation of Expert Witnesses and Objections to Impermissible Opinion Testimony of Lay Witnesses are **OVERRULED AS MOOT.** Plaintiff's claims are hereby **DISMISSED WITH PREJUDICE.**

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 14th day of August, 2007.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**